# **EXHIBIT A**

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY (SOLO PARA USO DE LA CORTE)

ENDORSED FILED SAN MATEO COUNTY

APR 29 2016

Clerk of the Superior Court
By S. YAMBING
DEPUTY CLERK

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

DIMENSIONAL HOLDINGS, INC., a corporation; DAVID G. BOOTH, an individual; REX A SINQUEFIELD, an individual

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

DAVID MARK, Trustee, on behalf of the John G. Mark Trust

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

SAN MATEO COUNTY SUPERIOR COURT, Southern Branch
500 County Center, Redwood City, CA 94063

CASE NUMBER: *(Número del Caso):* CIV538408

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

ANDREW A. AUGUST, ESQ.
BROWNE, GEORGE, ROSS, LLP, 101 California Street, Ste. 1225, Sacramento, CA 94111 (415) 391-7100

DATE: *(Fecha)* APR 29 2016 RODINA M. CATALANO Clerk, by *(Secretario)* SOCORRO YAMBING, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

COPY

FAXED

# NOTICE OF CASE MANAGEMENT CONFERENCE

David Mark, ETAL

ENDORSED FILED
SAN MATEO COUNTY

Case No: CIV538408

vs.

APR 29 2016

Date: 07·15·16

Dimensional Holding·INC· ETAL

Clerk of the Superior Court
By S. YAMBING
DEPUTY CLERK

Time 9:00 a.m.

Dept. ______ --on Tuesday & Thursday
Dept. 21 --on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1. In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:
   a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).
   b) Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.
   c) File and serve a completed Case Management Statement at least 15-days before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.
   d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.
2. **If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**
3. Continuances of Case Management Conferences are highly disfavored unless good cause is shown.
4. Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10–days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.
5. If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes," etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.
6. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.
7. The Case Management judge will issue orders at the conclusion of the conference that may include:
   a) Referring parties to voluntary ADR and setting an ADR completion date;
   b) Dismissing or severing claims or parties;
   c) Setting a trial date.
8. The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at: www.sanmateocourt.org

**Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).*

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Andrew A. August (SBN 112851)
Browne George Ross LLP
101 California Street, Suite 1225
San Francisco, CA 94108
TELEPHONE NO.: (415) 391-7100 FAX NO.: (415) 391-7198
ATTORNEY FOR (Name): Plaintiff, DAVID MARK, Trustee, John G. Mark Trust

FOR COURT USE ONLY

ENDORSED FILED
SAN MATEO COUNTY
APR 29 2016
Clerk of the Superior Court
By B. YAMBING DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: SOUTHERN

CASE NAME: DAVID MARK, Trustee, John G. Mark Trust v. DIMENSIONAL HOLDINGS, INC., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CIV538408 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☒ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action (specify): 3
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: April 28, 2016

ANDREW A. AUGUST, Esq.
(TYPE OR PRINT NAME)

▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

COPY FAXED

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36) Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

American LegalNet, Inc.
www.FormsWorkflow.com

BROWNE GEORGE ROSS LLP
Andrew A. August (State Bar No. 112851)
aaugust@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California 94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Attorneys for Plaintiff DAVID MARK, Trustee of the John G. Mark Trust

ENDORSED FILED
SAN MATEO COUNTY
APR 29 2016
Clerk of the Superior Court
By S. YAMBING
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

DAVID MARK, Trustee, on behalf of the John G. Mark Trust,

Plaintiff,

vs.

DIMENSIONAL HOLDINGS INC., a corporation; DAVID G. BOOTH, an individual; REX A. SINQUEFIELD, an individual; and Does 1 through 50,

Defendants.

Case No. CIV538408

**COMPLAINT**

**(1) Declaratory Relief**

**(2) Breach of Fiduciary Duty**

**(3) Injunctive Relief**

Trial Date: None Set

## I. INTRODUCTION

1. This case seeks to establish the right of Plaintiff John G. Mark Trust (the "Plaintiff" or "Trust") to transfer its shares in Defendant Dimensional Holdings Inc. ("Dimensional" or "Company") to Mr. Mark's children before his death. Dimensional has informed Plaintiff that because of a "policy" change to the Company's operative shareholder agreement, the Trust no longer has this right and upon any effort or threat by Plaintiff to effect an intergenerational transfer, Dimensional's controlling "Principal" shareholders have the right to and will force a "call" (i.e., purchase) of the Trust's shares. Because of this "policy" and the prohibition against any effort or threat by a shareholder to affect a transfer, the Trust seeks judicial authorization for the transfer.

FAXED COPY

2.      The controlling Principal shareholders of Dimensional, Defendants, David G. Booth and Rex A. Sinquefield exercised *de facto* control over the Company because of their status as majority shareholders and because they extracted from the minority shareholders years ago an irrevocable proxy allowing them to appoint the Company's board of directors.  They have caused the Company to adopt and implement an arbitrary, unreasonable, and legally impermissible "policy" forbidding minority shareholders to transfer their shares to their children during their lifetime.  This anti-intergenerational transfer policy (the "Policy") was adopted by the Board in executive session without minutes or formal resolution.  The Policy is a misuse of power by the Defendants to curtail the rights of the minority shareholders for the personal benefit and gain of the controlling shareholders in violation of their fiduciary duties to Plaintiff.

3.      The Policy also violates Dimensional's shareholders agreement, which forbids the Company from "unreasonably withholding" consent to a shareholder's stock transfer request and is impermissible under statutory and common law.  A stock transfer restriction not contained in the Company's Certificate of Incorporation, by-laws, or shareholders' agreement is not legally binding on shareholders, who never agreed to its proscriptions.  A corporation or its controlling shareholders may not impose stock restrictions that unreasonably curtail a minority shareholder's right to transfer stock, or otherwise deprive that shareholder of substantial rights.  Arbitrary restraints on alienation, such as the no-intergenerational-transfer policy are forbidden as a matter of public policy.

4.      The Policy is arbitrary, serves no legitimate corporate purpose and benefits only the controlling shareholders.  The sole purpose of the Policy articulated by Defendants is to preserve the Company's closely-held "feel."  This vague, imprecise, and amorphous justification does not countenance the unbridled power of Defendants Booth and Sinquefield to exercise their "call" rights under the shareholders agreement to purchase other shareholders' stock at a grossly devalued, unfair price.  Rather, such justification is a breach of the controlling shareholders' fiduciary duties of care, loyalty and good faith to the minority shareholders.

5.      Plaintiff has requested, and reiterates that request here, that the Company consent to the Trust transferring its shares to John G. Mark's children.  The transfer will not affect the

Company's tax status, its regulatory reporting obligations, or its corporate governance. However, the Defendants have refused and continue to refuse to consent to such a transfer and have threatened to invoke their call rights if such a transfer is attempted, necessitating this lawsuit.

## II. THE PARTIES, JURISDICTION AND VENUE

6. Plaintiff David Mark, a resident of San Mateo County, is trustee of the John G. Mark Trust ("the Trust"), and sues on behalf of the Trust. John G. Mark, the Trustee's father, is the beneficial owner of trust assets including the Dimensional stock at issue here.

7. Plaintiff is informed and believes that Defendants, David Booth and Rex Sinquefeld, together constitute the controlling shareholders of Dimensional and at all relevant times exercised *de facto* control over Dimensional's Board of Directors.

8. Plaintiff is informed and believes that Dimensional is a Delaware corporation with one or more offices in California conducting business in the State.

9. This court has personal jurisdiction over the named defendants because their activities in California are substantial, continuous, and systematic subjecting them to the general jurisdiction of the state's courts, consistent with the United States and California constitutions. Code Civ. Proc. §410.

10. Venue is proper in this county because the Trust is administered here; the Defendants' performance was to be made here; the Defendants' obligations and liability arose here (Code Civ. Proc. §395.5); and the wrongs restricting Plaintiff's ability to transfer property (causing injury) occurred here (*id.*; *see also Shida v. Japan Food Corp.*, 185 Cal. App. 2d 443, 449 (1960)). Also, Defendants Booth and Sinquefield, non-residents of the state, can be sued in any California county (Code Civ. Proc. §395 (a)) and Dimensional, a foreign corporation that has not designated an in-state principal place of business with the California Secretary of State, can be sued in any county (*Easton v. Superior Court*, 12 Cal. App. 3d 243, 246 (1970)).

11. Plaintiff does not know the true names, capacities, and activities of defendants sued as Does 1 through 50. Plaintiff is informed and believes they are, or have been, either (a) agents or employees of the named Defendants acting within the course and scope of that agency or employment, and responsible in some manner for the matters alleged or (b) independent actors

also in some way responsible. Plaintiff will seek leave of court to amend to allege the true names, capacities, and activities of all Doe Defendants when known.

## III. STATEMENT OF FACTS

### A. The Holdings Shareholders Agreement.

12. Until September 2006, the Trust was a minority shareholder in Dimensional Fund Advisors Inc. ("DFA"). Plaintiff is informed and believes Defendants Booth and Sinquefield founded DFA and were its majority and controlling shareholders before September 2006.

13. In September 2006, at the instance of Defendants Booth and Sinquefield, the DFA stockholders agreed to organize a new corporation, Dimensional, and to exchange their DFA shares for an equal number of Dimensional shares. Their agreement, memorialized in a share exchange agreement, stressed that the new corporation must adopt a stockholder agreement and be organized and operate as a Subchapter S Corporation ("S Corporation") under federal income tax laws and regulations, as DFA had previously operated.

14. S Corporations elect to pass corporate income and losses directly through to their shareholders for federal tax purposes. This allows them to avoid double taxation on corporate income. To qualify for S corporation status, the corporation must be domestic, have only allowable shareholders, one class of stock, and no more than 100 shareholders. Important here, the 100-shareholder requirement says "families" (including son and daughter) are considered a single shareholder by the IRS.

15. Dimensional filed its Certificate of Incorporation and by-laws with the State of Delaware on October 10, 2006. Neither document restricts shareholders' rights freely to sell or transfer their stock. The incorporation certificate is silent on the subject and the by-laws permit free alienation subject to shareholders' agreement otherwise.

16. Effective October 30, 2006, the Holdings shareholders adopted the *Dimensional Holdings Inc. Stockholders Agreement* (the "SHA"), a true copy of which is attached as Exhibit A. The SHA provides that during a shareholder's lifetime he or she may transfer stock to third parties if obtaining written consent from the Company, "which consent shall not be unreasonably withheld." That consent can be withheld where the transfer would cause the Company to lose S

Corporation status or where the prospective transferee does not agree in writing to be bound by the SHA's terms, neither exception applying to the intergenerational transfer requested here

17. The SHA further provides that if a shareholder dies, controlling shareholders Booth and Sinquefield, defined in the SHA as the "Principals," may call (*i.e.*, purchase) the stock of the deceased shareholder under a valuation formula involving gross fee revenues, number of "Fully Diluted Shares," and a revenue multiple described in the SHA. (Holdings SHA ¶¶3(a)(i), 3(c).)

18. Under the SHA Booth and Sinquefield have this same call right if any shareholder during his or her lifetime seeks to transfer stock after the Company has refused consent to the transfer—again the consent not unreasonably withheld. ( SHA ¶¶3(a)(v), 3(c).)

19. Under the SHA, holders of fifty-one percent of the outstanding stock can modify the SHA, meaning Defendants Booth and Sinquefield control any attempt to modify the agreement. Importantly, though, any modification that adversely affects an individual shareholder is ineffective unless consented to in writing by that shareholder. (Holdings SHA ¶17(b).)

**B. Booth's and Sinquefield's Control of Dimensional, Control Over Stock Alienation, and Adoption of the Anti-Intergenerational-Transfer Policy.**

20. The SHA required the minority shareholders to grant an irrevocable proxy to Booth and Sinquefield to designate themselves as perpetual members of Dimensional's Board of Directors with power to appoint all other board members. (SHA ¶11.) Aside from granting board-appointment rights, the irrevocable proxy gave Booth and Sinquefield control of the Company. It said that as the attorney, agent and proxy of each minority shareholder they could vote as the minority shareholders' proxy "as they . . . in their discretion deem[ed] proper" on any matter those shareholders were entitled to vote. Plaintiff is informed and believes that by reason of this broad grant of authority and further by reason of their status as majority shareholders Booth and Sinquefield at all times have exercised *de facto* control over Dimensional and its Board, have dictated Company policy, and have alone decided whether to consent to stock transfer requests.

21. On August 1, 2007, Defendant Booth sent a memorandum ("Booth Memorandum") to the Company's minority shareholders announcing the Policy which, among other things, disallows any intergenerational transfers of Dimensional stock. Mr. Booth stated that such a

"policy" had been carefully considered and approved by the Dimensional Board of Directors on April 20, 2007 and that no intergenerational transfers of Holdings stock would be approved except under "very limited circumstances," which were not identified. .

22. Attached to the Booth Memorandum was a document entitled *Policy Relating to Transfers of Dimensional Stock* ("4/20/07 policy statement"). Plaintiff is informed and believes and thereon alleges this is the only written statement of the Policy. A true copy of the Booth Memorandum and the 4/20/07 Policy Statement are attached here as Exhibit B.

23. Both the Booth Memorandum and the Policy recognize that intergenerational transfers would *not* affect the Company's S Corporation status because the IRS's 100-shareholder limitation rule treats family members as a single shareholder:

> Since most gift and other not-for-value transfers involve the stockholder's family members, it will usually be the case that such transfers will not affect S Corporation status.

Nevertheless, such transfers supposedly would generally fall outside the "policy considerations" stated in the Policy and therefore would "no longer be permitted unless otherwise approved by the Board of Directors under very limited circumstances that fall within the policy considerations stated above."

24. The only "policy consideration" identified in the Policy, however, was a vague statement it would be in the best interests of the Company to limit the number of stockholders:

> The Board believes that it is in the best interests of [the Company] and its stockholders to preserve . . . its private-company 'feel' and way of doing business, which have been fostered by the personal relationships between [the Company's] founders, management and stockholders.

25. If this Policy is permitted to stand it would clearly impose stock transfer restrictions not contained in the Company's Certificate of Incorporation, by-laws, or SHA. It also would be directly contrary to Dimensional's SHA's provision forbidding the Company to withhold, unreasonably, consent to stock transfers that did not affect S Corporation status. The stated desire

to limit the number of minority shareholders because of an amorphous corporate "feel" is not a legally-recognized reason to impose restrictions on minority shareholders' alienation rights.

26. Plaintiff is informed and believes that the Policy was adopted at an executive session of the Board of Directors at the request of Defendants Booth and Sinquefield to preserve and foster for their sole benefit, total control over stock ownership in the Company through their call rights.

27. Plaintiff is informed and believes that Defendants Booth and Sinquefield fully realize the Dimensional SHA's call price formula understates the stock's true value. Therefore Defendants Booth and Sinquefield have a personal interest to limit stock transfers that do not give rise to their call rights.

**C. Plaintiff's Unfruitful Attempts To Obtain Consent to Share Transfer and Defendants' Obfuscation Concerning Policy Rational and Policy Application.**

28. Since November 2014, Plaintiff has attempted, without success, to obtain from the Company:

- Consent to transfer Dimensional stock to John G. Mark's son and daughter;
- A clear and concrete explanation why the Policy was adopted and implemented even if there is no effect on the Company's Subchapter S status; and
- An explanation of the criteria the Company applies in granting "limited exceptions" to that policy.

29. Plaintiff has not been told whether Plaintiff's stock transfer consent request was ever presented to or considered by Dimensional's Board of Directors. Company representatives, however, presumably acting at the controlling shareholders' behest, have refused Plaintiff's request for consent.

**D. Plaintiff's November 27, 2014 Transfer Request.**

30. On November 27, 2014 Plaintiff emailed one of Dimensional's in-house lawyers, Jeff Jeon, requesting that the Company consent to the transfer of the trust shares to John Mark's heirs, subject to their consent to be bound be the SHA. Plaintiff pointed out that the inter-family transfer would not jeopardize the Company's S Corporation status and that the Policy, which

establishes a virtual ban on intergenerational transfers was not reasonable and was unfair to minority shareholders because it creates a situation where the controlling shareholders could "sweep up shares at below fair value by simply waiting for the current shareholders to die and exercising the calls" under the Dimensional SHA.

31. Plaintiff also noted that the Policy supposedly allowed for exceptions to the no-transfer policy under "very limited circumstances" but did not describe the criteria for making such exceptions or explain the process for appealing a no-transfer decision. He requested to know both.

**E. Attorney Jeon's January 28, 2015 E-mail.**

32. Mr. Jeon responded by email on January 28, 2015 stating that the Company position was that intergenerational transfers like that proposed by Plaintiff "are not approved." Mr. Jeon admitted that intergenerational transfers would not affect S Corporation status. But, quoting from the Booth Memorandum, he repeated the Company's ambiguous mantra: such transfers might result in "unbridled growth in the number of stockholders [and] raise new and different legal and operational considerations."

33. Mr. Jeon's email ignored entirely that part of Plaintiff's November 27, 2014 email asking what criteria satisfied the "limited circumstances" exceptions to the no-transfer policy.

34. Since it was unclear whether Mr. Jeon had authority to reject Plaintiff's stock transfer request, Plaintiff emailed him on February 2, 2015 asking for certainty on the Company's position. Plaintiff also asked, again, that he explain the Company's criteria for exceptions to the no-transfer policy.

35. Mr. Jeon did not respond.

**F. Plaintiff's February 14, 2015 Attempt To Clarify.**

36. Frustrated by attorney Jeon's silence, Plaintiff on February 14, 2015 emailed Julie Henderson (a Dimensional officer), expressing his frustration in getting unclear, ambiguous, and "non-responses" to his stock transfer request. Plaintiff noted that Mr. Jeon's vague emails did not outright deny a transfer request, and did not explain either the criteria for exceptions to the no-transfer policy or the rights to appeal from a denial decision.

37. Plaintiff requested from Ms. Henderson a clear statement from the Company about both his transfer request and the criteria applied in making exceptions to the no-intergeneration-transfer policy.

**G. Dimensional's CFO Responds.**

38. In an email dated February 25, 2015, Dimensional's CFO, David Martin, responded to Plaintiff. Mr. Martin said that Mr. Jeon was acting on behalf of the Company's senior management in sending his January 28, 2015 email. He then set out verbatim the portion of the Policy concerning private-company "feel":

> The Board believes that it is the best interests of [the Company] and its stockholders to preserve . . . its private-company 'feel' and way of doing business, which have been fostered by the personal relationships between [the Company's] founders, management and stockholders . . . .

Mr. Martin said that Plaintiff's proposed intergenerational transfer did not "fall within [these] stated policy considerations." On exceptions to the no-transfer policy, Mr. Martin said transfers had been allowed where they "were known to the board when the [Policy] was adopted."

39. In August 2015, the Trust's attorney formally requested in writing that the Company consent to Plaintiff's request for intergenerational transfer; Mr. Martin summarily denied that request.

**H. Plaintiff's Unfruitful Attempts To Obtain Information from the Company.**

40. In December 2015, Plaintiff's attorney sent a document request to counsel for the Company, requesting among other things the Company Articles of Incorporation and By-Laws, the Holdings SHA reflecting any amendments, a current list of Company shareholders, minutes and resolutions of the Dimensional Board concerning the Policy and requests for intergenerational transfers made by other shareholders.

41. The Company's outside counsel replied by letter of January 15, 2015, reinforcing the controlling shareholders' misuse of their power to oppress Plaintiff's shareholder rights for their own personal gain. The letter denied Plaintiff's request for a Company shareholder list unless

Plaintiff signed an agreement prohibiting disclosure of this information to anyone, including other minority shareholders, and forbidding its use except in unreasonably limited circumstances. The letter also explained, for the first time, that the Policy was passed in "executive session" of the Board (whatever that means), though no board resolution or minutes exist.

**FIRST CAUSE OF ACTION**

**(Declaratory Relief (vs. all Defendants))**

42. Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 41.

43. The Dimensional Certificate of Incorporation and By-Laws contain no restrictions on transfer of Dimensional stock. The only transfer restrictions are those contained in the SHA and those restrictions do not prohibit intergenerational transfers and prohibit the Company from unreasonably withholding consent to any transfer that will not affect the Company's corporate status. The anti-intergenerational-transfer policy is contained solely in the Policy.

44. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties about Plaintiff's request to transfer John G. Mark's Dimensional stock to his children. Plaintiff contends the Policy is an arbitrary, impermissible and unlawful attempt to modify the Company's Certificate of Incorporation, by-laws, and SHA to impose more rigid transfer restrictions than exist in those documents and is an unlawful restraint on John Mark's to transfer his Dimensional shares to his children. Plaintiff contends the Policy is unenforceable and may not properly be invoked to prohibit the transfer of the Trust's shares because those shares were issued before the Policy was adopted and Plaintiff has never agreed or voted for the Policy. *See* California Corporations Code §§ 204(b) and 212(b)(1); 8 Delaware Code § 202(b). Plaintiff is informed and believes that Defendants contend that the Policy is not arbitrary, is permissible and enforceable under both California and Delaware law.

45. Plaintiff further contends the Policy is impermissible under common law principles forbidding unreasonable restrictions on free alienation of property. The policy imposes stock restrictions that unreasonably curtail shareholders' rights to transfer stock, deprives shareholders of substantial rights, and does not serve a demonstrably legitimate corporate purpose. Plaintiff is informed and believes that Defendants contend otherwise.

46. Plaintiff requests a declaration that the Policy as applied to Plaintiff is (a) unenforceable as an unlawful attempt to retroactively impose a stock transfer restriction not contained in the Company's Certificate of Incorporation, by-laws, or SHA, and (b) contrary to public policy as an unreasonable restraint on free alienation of property.

47. A judicial declaration is necessary and appropriate so Plaintiff may ascertain his rights and duties about John G. Mark's desire to transfer his Dimensional shares to his children during his lifetime.

**FIRST CAUSE OF ACTION**

**(Breach of Fiduciary Duty vs. Defendants Booth and Sinquefield)**

48. Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 41.

49. As controlling shareholders of Dimensional, Defendants Booth and Sinquefield owed a fiduciary duty of care, loyalty and good faith to Dimensional's minority shareholders, including Plaintiff, to make informed and deliberate business decisions in the best interests of Dimensional and not to base those decisions on their own personal interests or for their personal gain.

50. Defendants Booth and Sinquefield breached their fiduciary duties to Plaintiff as a minority shareholder by causing the Company to adopt the Policy which Defendants knew is contrary to Plaintiff's interests as a minority shareholder and promotes their own personal financial interests.

51. Defendants Booth and Sinquefield have further breached their fiduciary duties to Plaintiff as a minority shareholder by causing representatives of Dimensional to refuse Plaintiff's stock transfer requests on the basis of vague standards that Defendants arbitrarily created to defeat minority shareholder alienation rights for their own personal benefit and gain.

52. Defendants Booth and Sinquefield have further breached their fiduciary duties to minority shareholders by causing representatives of Dimensional to withhold corporate information about minority shareholder identity and stock transfer history.

53. Defendants Booth and Sinquefield have further breached their fiduciary duties to minority shareholders by purporting to unilaterally amend the SHA in violation of the amendment

provisions of that document.

**SECOND CAUSE OF ACTION**

**(Injunctive Relief vs. all Defendants)**

54. Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 41.

55. Plaintiff is informed and believes that Defendants may contend that (a) Plaintiff's request to transfers shares and (b) the filing of this lawsuit triggers the Principals' and the Company's right to invoke the "call" provisions of section 3 of the Dimensional SHA If Defendants do so, Plaintiff requests a temporary and permanent injunction forbidding Defendants from invoking the call provisions pending finalization of the case.

**PRAYER**

Plaintiff seeks the following:

1. A declaration that the Policy is unenforceable as to Plaintiff;

2. An order enjoining Defendants from exercising call rights under the SHA as to Plaintiff's shares;

3. Such equitable relief as the court deems just and proper to address Defendants, Booth and Sinquefeld's breaches of fiduciary duty; and

4. Such other relief, whether legal or equitable, as the court deems just and proper.

Dated: April 28, 2016

BROWNE GEORGE ROSS LLP

By [signature]
Andrew A. August
Attorneys for Plaintiff DAVID MARK,
Trustee of the John G. Mark Trust

# EXHIBIT A



**DIMENSIONAL HOLDINGS INC.**

**STOCKHOLDERS AGREEMENT**

**October 31, 2006**

**DIMENSIONAL HOLDINGS INC.**
**STOCKHOLDERS AGREEMENT**

THIS STOCKHOLDERS AGREEMENT (the "Agreement") by and among Dimensional Holdings Inc., a Delaware corporation (the "Company") and the stockholders of the Company (each individually a "Stockholder" and collectively the "Stockholders"), effective as set forth in Paragraph 21 below.

In accordance with the Dimensional Holdings Inc. Share Exchange Agreement (the "Share Exchange Agreement"), the Company has issued shares of common stock, $0.10 par vale per share (the "Stock"), to the Stockholders on a one-for-one basis in exchange for shares of common stock of Dimensional Fund Advisors Inc. ("Dimensional"), whereupon Dimensional became a wholly-owned subsidiary of the Company.

As contemplated by the Share Exchange Agreement, the Company has elected to be treated as an "S Corporation" under federal income tax laws and regulations (the "S Corporation Election"), and each holder of Stock has consented thereto.

In furtherance of the S Corporation Election and as provided by the Share Exchange Agreement, the Board of Directors of the Company has adopted and approved this Stockholders Agreement relating to the transferability and voting of the Stock and other matters, the terms of which are substantially the same as the Dimensional Fund Advisors Inc. Stockholders Agreement as in effect at the time of the share exchange (the "Dimensional Stockholders Agreement").

Each Stockholder by virtue of having entered into the Share Exchange Agreement has agreed to be a party to and bound by this Agreement and the provisions hereof including, without limitation the terms and provisions of this Agreement relating to the maintenance by the Company of the S Corporation Election, the making of or consent to any elections of Company or any Stockholder necessary with respect thereto, the limitations on the transfer of Stock and the provisions regarding put and call elections, and the irrevocable proxy granted with respect to the election of directors.

NOW THEREFORE, in recognition and consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto agree as follows, effective as set forth in Paragraph 21 below:

1. **Definitions**. As used in this Agreement:

(a) "Transfer" or "transfer" means any disposition or transfer whatsoever, whether voluntary or involuntary, including but not limited to a sale, assignment, gift, exchange, attachment, garnishment, foreclosure, pledge (or other assignment) as security for any loan or the discretionary or obligatory distribution from a trust; but said term shall not include, and the restrictions on transfer set forth in this Agreement shall not apply to any transfer by a Stockholder of all or any part of the Stockholder's Stock in any transaction in which all or substantially all of the Stock of the Company is transferred or exchanged pursuant to any reorganization, merger, consolidation or sale, or pursuant to the purchase of any Stock by the Company.

(b) "Code" means the Internal Revenue Code of 1986, as heretofore or hereafter amended, and includes corresponding provisions of previous or subsequent federal tax laws.

(c) "QSST" shall mean a Qualified Subchapter S Trust as described in Section 1361(d)(3) of the Code.

(d) "Employee Stock" means Stock held by Stockholder, if any, which was purchased from the Company by or for the benefit of an employee or consultant pursuant to an Employee Stock Purchase Agreement or a Consultant Stock Purchase Agreement. For purposes of this Agreement, Stock issued pursuant to the Share Exchange Agreement in exchange for stock which constituted "Employee Stock" under the Dimensional Stockholder Agreement shall be Employee Stock hereunder and, in accordance with the Share Exchange Agreement, shall be subject to the provisions of the Employee Stock Purchase Agreement, Consultant Stock Purchase Agreement and/or any other agreement with Dimensional relating thereto, as if such agreement were entered into with the Company.

(e) "Employee Stock Offering" means each offering and sale of Employee Stock by the Company which may occur and, which respect to Stock treated as Employee Stock pursuant to the second sentence of clause (d) above, each Employee Stock Offering by Dimensional which occurred in June and July 1995, February, 1996 and each other offering and sale thereafter.

(f) "Principals" means David G. Booth and Rex A. Sinquefield.

(g) "Principal Stock" means Stock held, singly or jointly, by or for the benefit of a Principal.

2. **<u>Restrictions During Life</u>**. In addition to the restrictions set forth in Paragraph 5 below, the Stockholder shall not (1) transfer all or any part of the Stock owned at any time by the Stockholder by gift or otherwise, or (2) pledge or otherwise assign for security all or any part of such Stock, unless and until said Stockholder shall first have obtained the written consent of the Company, which consent shall not be unreasonably withheld; provided, however, that in no event shall the Company be obligated to consent to or otherwise recognize any transfer to a transferee or issue a stock certificate in the name of any transferee until (A) the Company has determined, in its sole discretion, that such transfer would not cause the Company to lose its status as an S Corporation, and (B) such transferee has agreed in writing to be bound as a "Stockholder" under this Agreement and to hold the Stock transferred subject to all of the terms and conditions of this Agreement; and, provided further, in no event shall a Stockholder be permitted to transfer any Employee Stock while the Stockholder is employed by or is serving as a consultant to the Company, nor shall the Company be obligated to consent or otherwise recognize any such transfer of Employee Stock.

3. **Call Rights of Principals and Company; Stockholder Put Election.**

(a) Call Rights of Principals and Company. In the event:

(i) the Stockholder desires to sell Stock pursuant to a bona fide arms'-length transaction that is not otherwise barred by Paragraph 2 or 5 hereof; or

(ii) the Stockholder dies; or

(iii) the Stock becomes subject to a right of involuntary transfer by operation of law; or

(iv) the Stockholder declares or is involuntarily placed into bankruptcy; or

(v) the Stockholder violates or threatens to violate Paragraph 2 or 5 hereof;

then the Principals shall have Call Rights to purchase the Stock at the purchase price described below, and, to the extent not exercised by the Principals, the Company shall have such Call Rights with respect to such Stock; provided, however, that in the event of the death of a Principal, neither the other Principal nor the Company shall have any Call Rights with regard to the Principal Stock of the deceased Principal unless one of the other events described in (i), (iii), (iv) or (v) above has also occurred. The Stockholder shall provide the Company and the Principals with at least twenty (20) business days prior written notice of any proposed sale described in subparagraph (i) above, or that an event described in subparagraph 3(a)(iii) or (iv) will or is likely to occur, or if prior notice of an event described in subparagraph 3(a)(iii) or (iv) could not be so given, then Stockholder shall provide such notice as soon as possible and in no event later than five (5) business days after such event. The written notice shall describe the event and, in the case of an event described in subparagraph 3(a)(i), the terms of the proposed sale. The Stockholder's estate shall provide written notice within thirty (30) days after the Stockholder's death.

(b) Exercise of Call Rights. Upon receipt of such notice, the Principals shall have five (5) business days in which to provide the Stockholder and the Company with notice of exercise of the Call Rights pursuant to this Paragraph 3. The Principals shall exercise such Call Rights in proportion to the number of shares of Stock owned by them as of the date such Call Rights arise, or in such other manner as they may mutually determine. To the extent that Call Rights arise with regard to a Principal's Principal Stock, then the Call Rights shall be exercisable by the other Principal subject to the limitation set forth in Section 3(a) above. In the event the Principals do not so exercise the Call Rights, then the Company shall have thirty (30) business days from the expiration of the period during which the Principals could exercise their Call Rights in which to provide the Stockholder with notice of exercise of the Company's Call Rights.

(c) Purchase Price Per Share. The purchase price per share of Stock to be paid upon the exercise of Call Rights pursuant to this Paragraph 3 shall be:

(i) in the case of a proposed sale described in subparagraph (3)(a)(i) above, the per share price to be paid in the proposed sale of Stock as described in the notice provided by the Stockholder;

(ii) in all other cases, the quotient of (A) the product of the revenue multiple (as defined below in this subparagraph (c)) times the Company's gross fee revenues (as defined below in this subparagraph (c)) for the calendar quarter ending immediately following the delivery of notice of exercise of the Call Rights to the Stockholder or his estate, as the case may be, determined in accordance with the Company's financial statements for that quarter, divided by (B) the number of Fully Diluted Shares (as defined below in this subparagraph (c)) as of the last day of such quarter.

Except as otherwise provided in Paragraph 4(a), the revenue multiple means 9.834. The term "gross fee revenues" means the Company's gross fee revenues as reported on the Company's consolidated financial statements, provided that with respect to any subsidiary which is not wholly-owned, a portion of the gross fee revenues of each such subsidiary shall be excluded, such exclusion to be the portion of the revenue of the subsidiary for the quarter taken into account in the valuation of shares of such subsidiary not owned by the Company. The term "Fully Diluted Shares" means, at any time the sum of (x) the number of shares of Stock outstanding at such time (including shares with respect to which any Stockholder or the Company has given notice of the exercise of Put or Call Rights or Elections, and excluding shares sold by the Company or which became issued and outstanding during the calendar quarter), plus (y) the number of shares of Stock issuable upon exercise of any options, warrants or other common stock equivalents outstanding and exercisable at the beginning of the calendar quarter. In addition, the number of "Fully Diluted Shares" shall be subject to adjustment pursuant to Paragraph 9 below.

(d) <u>Closing and Payment of Purchase Price for Called Shares</u>. Subject to subparagraph 3(f) below, the closing of the purchase pursuant to the notice of exercise of the Call Rights shall be effective as of the date the notice is given. Payment of the purchase price in connection with the exercise of Call Rights pursuant to subparagraph (a) of this Paragraph 3 shall be made as soon as practicable after completion of the financial statements that will be used to determine the price per share of the Stock (or in the case of a purchase subject to subparagraph 3(c)(i), as soon as practicable following the end of the calendar quarter in which such Call Right was exercised). In the event that the aggregate amount that the Principals or the Company would be required to pay in any one calendar quarter for the purchase price attributable to all of the Stock with respect to which Call Rights have been exercised pursuant to this Paragraph 3 would exceed one (1) percent of the Company's gross fee revenues for the twelve (12) month period immediately preceding the calendar quarter in which payments are to be made (the "One Percent Limitation"), the Principals or the Company, as the case may be, shall have the option, as described in subparagraph 4(b) below, upon notice to the Stockholder, to defer for a period of up to 180 days the payment of all or any portion of the purchase price required pursuant to subparagraph 3(c) which exceeds the One Percent Limitation. The payment of the purchase price, whenever made, shall be equal to the sum of (1) the purchase price determined in accordance with subparagraph 3(c), plus (2) interest on such purchase price determined from the date of closing through the payment date at the total rate of return on the DFA One-Year Fixed

Income Portfolio of DFA Investment Dimensions Group Inc. (or if such Portfolio ceases to exist, interest at a rate equal to the greater of 10% per annum or the lowest applicable federal rate that will avoid imputation of interest under the Code).

(e) Stockholder Put Election. Each Stockholder shall have the right to put Stock to the Company upon written notice to the Company as hereafter provided (a "Put Election").

(i) A Stockholder may make a Put Election at any time during the first two months of a calendar quarter. A Put Election made during the third month of a calendar quarter shall be deemed to have been delivered on the first business day of the following quarter. Each Put Election received by the last business day of February, May, August or November shall be deemed effective for that calendar quarter and the purchase price for the Stock subject to the Put Election (the "Put Shares") will be the amount described in Paragraph 3(c)(ii) above determined as of the end of such calendar quarter. A Put Election may be made with regard to all or less than all of a Stockholder's Stock, subject to a minimum of 100 shares (or if less, all of the shares then owned). No Stockholder may exercise more than one Put Election during any four consecutive calendar quarters.

(ii) The closing of the purchase of the Put Shares shall be made as soon as practicable after the receipt of the quarterly financial statements on which the purchase price is to be determined. All Put Shares subject to timely Put Elections shall be purchased, subject to the following restrictions:

(1) The Company shall not be obligated to purchase Put Shares to the extent that the aggregate purchase price paid for Put Shares during a calendar year would exceed the Cash Available for Puts (as defined below) for such calendar year, determined as of the end of the quarter during which the Put Election was made. "Cash Available for Puts" is equal to 80% of the amount of net cash provided by operating activities as determined from the Company's consolidated statement of cash flows for the calendar year as of the end of the applicable quarter, reduced by the sum of the following:

(A) the amount of year-to-date net income previously distributed or declared to be distributed to stockholders as of the end of the quarter (which for this purpose shall exclude amounts distributed or declared during the calendar year that relate to the prior calendar year, such as amounts distributed prior to January 15th of such calendar year or the amount of any Prior Year Tax Amount described in subparagraph 5(d)(1)(B) below which is distributed during the calendar year);

(B) the additional amount of net income, if any, required to be distributed to stockholders pursuant to Paragraph 5 below, but not distributed or declared to be distributed as of the end of the quarter;

(C) amounts paid or required to be paid for shares with respect to which Call Rights have been exercised pursuant to the preceding provisions of this Paragraph 3 or Call Rights or Put Rights on Employee Stock have been exercised pursuant to Paragraph 4 below; and

(D) year-to-date amounts paid through quarter-end to purchase Put Shares.

(2) In the event the number of Put Shares to be purchased is limited by the Company because the Cash Available for Puts is less than the aggregate purchase price that would be paid for Put Shares, then the Put Shares shall be purchased by the Company on a pro rata basis (as determined below), up to such number of Put Shares as have an aggregate purchase price equal to the Cash Available for Puts. The Put Election with respect to any Stock not purchased shall be cancelled and of no force and effect, provided that the Stockholder may submit a Put Election with respect to such shares in any subsequent quarter without regard to the once-every-four quarters limitation. For purposes of determining the Stock to be purchased in the event proration is required, up to 100 shares shall be purchased from each Stockholder who has made a Put Election and then, to the extent additional Put Shares may be purchased, such remaining shares shall be purchased pro rata. If purchasing 100 shares per Stockholder would result in an aggregate purchase price in excess of the Cash Available for Puts, then the shares per Stockholder to be purchased shall be reduced as determined by the Company to such fewer number of shares per Stockholder such that the aggregate purchase price for such Put Shares no longer exceeds the Cash Available for Puts.

(3) Notwithstanding anything to the contrary, the Company will not be obligated to purchase any Put Shares (and the Put Election with respect to such shares shall be cancelled and of no force and effect) to the extent the Board of Directors determines that:

(A) the Company is precluded by applicable Delaware law limitations from doing so;

(B) such purchase would constitute or cause a "change of control" or would otherwise require consents or approvals of the Company's clients or the shareholders of any investment company for which the Company acts as an investment adviser, under applicable securities laws, rules, regulations or exemptive orders subject to Paragraph 3(f) below; or

(C) such purchase would result in adverse tax consequences to other Stockholders.

(f) Deferral of Closing Date of Purchase of Principal Stock. The closing date of the purchase of any Principal Stock by the Company pursuant to this Paragraph 3 may be

deferred at the discretion of the Company for ninety (90) days or such shorter or longer period as the Company may reasonably require in order to enable the Company and/or any investment company to which the Company acts as an investment advisor to obtain such consents or approvals as may be required under applicable securities laws, rules, regulations or exemptive orders with regard to any change of control which may occur as a result of the Company's purchase of such Stock.

(g) Coordination with Paragraph 4. To the extent that an event which gives rise to Call Rights pursuant to this Paragraph 3 with regard to Employee Stock also gives rise to Put and/or Call Rights pursuant to Paragraph 4 below, then the provisions of Paragraph 4 below shall apply and no Call Rights will be deemed to arise under this Paragraph 3.

4. **Stockholder's Right to Sell Employee Stock; Company's Right to Purchase Employee Stock.**

(a) Upon termination of the Stockholder's employment for any reason, including termination by the Company with or without cause, termination by reason of death or disability, or voluntary termination by the Stockholder, the Stockholder, which term in the case of the death of the Stockholder shall include the Stockholder's estate, shall have the right, upon notice to the Company, to cause the Company to purchase any or all of the Stockholder's Employee Stock (the "Put Rights") and the Company shall have the independent right to purchase any or all of such Employee Stock (the "Call Rights") at a per share price, in either case, equal to the amount determined under Paragraph 3(c)(ii) above for the calendar quarter ending immediately following the Company's receipt of notice of exercise of Put Rights or the Company's giving of notice of exercise of Call Rights to the Stockholder or his estate, as the case may be; provided, however, that with respect to any shares of Employee Stock purchased in Employee Stock Offerings after 2005 at a purchase price determined in a manner consistent with the methodology employed under Paragraph 3(c)(ii) using a revenue multiple which is different than the 9.834 revenue multiple set forth in Paragraph 3(c), then such different revenue multiple shall be the revenue multiple used under Paragraph 3(c)(ii) for purposes of determining the purchase price to be paid for such shares under this Paragraph 4(a). Put Rights with regard to Employee Stock under this Paragraph 4 are in addition to the Put Election available to the Stockholder under Paragraph 3 above; provided, that any exercise of Put Rights with respect to Employee Stock under this Paragraph 4 shall be governed by this Paragraph 4 and such exercise shall not be deemed to be a Put Election under Paragraph 3. The Put Rights and Call Rights under this Paragraph 4 shall terminate upon the expiration of the one year period commencing from the termination of employment. The provisions of Paragraphs 2 and 5 relating to the restrictions on transferability and of Paragraph 3 relating to Call Rights and the Put Election shall continue to apply to the Employee Stock. For purposes of this Paragraph 4, a Stockholder's termination of employment shall not be deemed to occur unless the Stockholder ceases to be an employee of the Company and all of its subsidiaries.

(b) The closing of the purchase pursuant to the notice of exercise of the Put or Call Right shall be effective as of the date the notice is given. Payment of the purchase price in connection with the exercise of Put or Call Rights pursuant to subparagraph 4(a) shall be made as soon as practicable after completion of the quarterly financial statements that will be used to determine the price per share of the Stock. In the event that the aggregate amount that the

Company would be required to pay in four consecutive quarters as purchase price with respect to all of the Employee Stock attributable to an Employee Stock Offering with regard to which Put Rights have been exercised pursuant to subparagraph 4(a) would exceed one (1) percent of the Company's gross fee revenues for the four consecutive quarters ending immediately preceding the quarter in which payments are to be made (the "One Percent Limitation"), the Company shall have the option, upon notice to the Stockholder, to defer payment of all or any portion of the purchase price for Employee Stock attributable to each such Employee Stock Offering which exceeds the One Percent Limitation. If the Company exercises its option to defer, the Company will pay all or a portion of the purchase price of such Stock, as the case may be, in such subsequent calendar quarter when the portion of the purchase price to be paid for all or a portion of the Stockholder's Stock together with the purchase price of Employee Stock of any other employee who has priority over the Stockholder, as described below, does not exceed one (1) percent of the Company's gross fee revenues for the four consecutive calendar quarters immediately preceding the fiscal year. Priority shall be determined by reference to the first in time to give notice to the Company of the exercise of the Put Rights. The payment of the purchase price, whenever made, shall be equal to the sum of (1) the purchase price determined in accordance with subparagraph (a) of this Paragraph 4, plus (2) interest on such purchase price determined from the date of closing through the payment date at the total rate of return on the DFA One-Year Fixed Income Portfolio of DFA Investment Dimensions Group Inc. (or if such Portfolio ceases to exist, interest at a rate equal to the greater of 10% per annum or the lowest applicable federal rate that will avoid imputation of income under the Code).

5. **Special S Corporation Contract Provisions**.

(a) Eligibility. Stockholder has been advised that in order for the Company to be eligible to make and maintain the S Corporation Election and S Corporation or similar status under applicable state or local tax laws or regulations (collectively, "State Laws"), the Company cannot, among other things, have as an owner or deemed owner, including but not limited to spouses in community property states and certain trusts, of Stock any person who is not an individual, an estate, or a trust which is eligible to be an S Corporation shareholder pursuant to said Section 1361 of the Code, or who is a nonresident alien, or have a number of stockholders in excess of the limitation on the number of stockholders set forth in Section 1361 or applicable State Laws. Stockholder hereby represents, warrants and agrees that, as of the date hereof and for so long as Stockholder is subject to this Agreement, Stockholder:

(i) is and will continue to be an individual, or an estate, or a trust which is eligible to be an S Corporation shareholder pursuant to Section 1361 of the Code, and as may be required by the Company pursuant to State Laws, and that Stockholder does not hold the Stock in a nominee or other capacity for any other person;

(ii) is and will continue to be either a citizen of the United States of America or a resident of the United States of America (within the meaning of Section 7701(b)(1)(A) of the Code);

(iii) has, or will promptly make, and shall thereafter not revoke, any election as may be required under Section 1361(c)(1)(A)(ii) of the Code to treat all members of Stockholder's family as one shareholder for purposes of said Section 1361; and

(iv) will provide information in form and substance satisfactory to the Company as the Company may request in order to enable the Company to confirm Stockholder's compliance with this subparagraph 5(a) or the Company's compliance with the provisions of this Paragraph 5, including, but not limited to, information relating to the determination of the Stockholder's family members for purposes of Section 1361 of the Code.

(b) Consent to S Corporation Election. Stockholder hereby consents and agrees to the actions taken and/or intended to be taken by the Company in connection with the Company's S Corporation Election and Stockholder hereby agrees to execute for filing with the Internal Revenue Service such forms and consents as may be required with respect thereto. Stockholder also hereby consents and agrees to the actions taken and/or intended to be taken by the Company in connection with any similar election which the Company may make under any state tax law and Stockholder hereby agrees to execute for filing with the appropriate state governmental authority such forms and consents as may be required with respect thereto.

(c) Maintenance of S Corporation Election. Until the Company and the holders of a majority of its issued and outstanding shares decide to terminate the Company's S Corporation Election, the following will apply:

(i) Neither the Company nor any Stockholder by any act or failure to act shall terminate, or have the effect of terminating, the S Corporation Election or, as may be required by the Company, S Corporation or similar status under State Laws, unless the Company by act of Stockholders owning a majority of the Stock, first directs such act or failure to act. Each Stockholder shall promptly act or fail to act as may be necessary to terminate such election as and when the Company so directs.

(ii) Except to the extent authorized pursuant to the preceding subparagraph, no Stockholder shall transfer any Stock, now owned or hereafter acquired, nor shall any Stockholder that is a QSST or other trust have its trust agreement amended or revoked unless prior thereto (A) the Company shall have received a written opinion of counsel in form and substance satisfactory to the Company that the transfer or amendment or revocation will not have the effect of terminating the S Corporation Election and, as may be required by the Company, similar status under State Laws, and (B) the proposed transferee or beneficiary of the transferee (as the case may be) shall have agreed in writing to affirmatively consent to such election at any time the Company's attorney deems such consent to be necessary to the continuation of such election. Any transfer of Stock or revocation of or amendment to a trust agreement or a trust that is a Stockholder that is in violation of this subparagraph 5(c) shall be void.

(iii) If any violation or threatened violation of this subparagraph 5(c) occurs, the Company may give notice to the Stockholder of such violation of this subparagraph 5(c), and shall have the Call Rights with respect thereto in accordance with Paragraph 3 above.

(iv) Nothing in this subparagraph 5(c) affects the obligation of Stockholders to comply with the other provisions of this Agreement governing the proposed transfer of Stock.

(d) Distributions for Federal and State Income Taxes. Under the S Corporation Election, the beneficial owners of Shares will be required to take the Company's items of income, loss, deduction, and credit into account in determining their individual federal and state income tax liabilities. To assist the Stockholders in meeting the additional income tax obligations expected to result from the pass through of the Company's tax items, the Company shall make certain minimum distributions with respect to the Stock for periods during which the S Corporation Election is in effect. Except to the extent expressly provided herein, this subparagraph 5(d) is not intended to confer on any person the right to distributions with respect to the Company's Stock.

(1) Distribution Amounts. On or before each date prescribed by the Code for individuals to make installment payments of their estimated federal income tax liabilities, the Company shall determine the Estimated Tax Amount for such date in accordance with subparagraph (A) below and shall distribute at a minimum a cash amount on or before such estimated tax due date with respect to its outstanding Stock equal to such Estimated Tax Amount. On or before each April 15, the Company shall determine the Prior Year Tax Amount in accordance with subparagraph (B) below and shall distribute at a minimum a cash amount on or prior to such April 15 with respect to each share of Stock equal to the Prior Year Tax Amount. These two amounts shall be determined as follows:

(A) Estimated Tax Amount. First, multiply (1) the combined maximum federal and California regular income tax rates applicable to individuals for the current calendar year (taking into account and assuming the full deductibility of California income taxes for federal income tax purposes), by (2) the Company's estimate of any positive net amount of the Company's taxable items of income, deduction and loss ("Net Positive Tax Items") to be passed through to the owners of Stock on the Company's return for any taxable year ending within the current calendar year. Second, multiply the foregoing product by (3) the following percentage corresponding to the estimated tax due date involved: April 15, 25%; June 15, 50%; September 15, 75%; and January 15 of the next calendar year, 100%. Finally, reduce the foregoing product by (4) the total of any Estimated Tax Amounts previously distributed with respect to such stock for the current calendar year. The result is the Estimated Tax Amount. Any amounts distributed prior to January 15 of the current calendar year or any amount distributed during the current calendar year pursuant to subparagraph (B) below shall be

deemed to be distributions relating to the prior calendar year and, accordingly, shall not be included under clause (4) as distributions of Estimated Tax Amounts for the current calendar year.

(B) Prior Year Tax Amount. First, multiply (1) the combined maximum federal and California regular income tax rates applicable to individuals for the prior calendar year (taking into account and assuming the full deductibility of California income taxes for federal income tax purposes), by (2) the Company's determination of the Net Positive Tax Items passed through with respect to such Stock on the Company's return for the taxable year(s) ending within the prior calendar year. Second, reduce the foregoing amount by (3) the total of any amounts previously distributed as Estimated Tax Amounts with respect to such prior calendar year. The result is the Prior Year Tax Amount.

(C) Capital Gain or Loss. In determining any Estimated Tax Amount or Prior Year Tax Amount the following shall be taken into account: (i) if the Company has or anticipates a net long-term or short-term capital loss for the year, such net capital loss shall be ignored; or (ii) if the Company has or expects a substantial net long-term capital gain for the year, the assumed tax rates or Net Positive Tax Items shall be adjusted to reflect the lesser tax burden (if any) imposed on such gain.

(2) The Company's accountants shall determine the amounts and payment dates of the distributions required by subparagraph 5(d)(1) based on information and estimates provided by the Company. Such determinations shall be binding on all concerned parties. The Company's Board of Directors shall determine the dates upon which required distributions shall be made, but in the event that state law precludes the Company from making the entire distribution otherwise required by subparagraph 5(d)(1), the maximum permissible amount shall be distributed on a timely basis and the remainder shall be distributed as soon as possible thereafter.

(3) All distributions required by subparagraph 5(d)(1) shall be made with respect to all outstanding shares of Stock as of the time such distribution is declared without any preference.

(4) With respect to 2006, the determination of amounts under the Paragraph 5(d) shall take into account the determination and payment of amounts by Dimensional prior to the share exchange.

(e) Reporting S Corporation Items. To the extent permitted by law, the Stockholders shall, if so directed by the Company's Board of Directors, elect to cause the Company's items of income, loss, deduction, and credit to be allocated (and reported to Stockholders) in accordance with the "closing of the books" method of allocation described in Section 1377(a)(2) and Section 1362(e)(3) of the Code. The Company's accountants shall

determine the items so allocable and reportable to the Stockholders and their determinations shall bind all concerned parties.

6. **Specific Performance**. The parties hereto hereby declare that it would be impossible to measure the money damages which will accrue to a party hereto or to the personal representative of a decedent Stockholder by reason of a failure to perform any of the obligations under this Agreement. Therefore, if any party hereto or the personal representative of a decedent Stockholder shall institute any action or proceeding to enforce the provisions hereof, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense herein that such person has an adequate remedy at law, and such person shall not urge in action or proceeding the claim or defense that such remedy at law exists and is adequate. Any party hereto who successfully enforces the specific performance of any provision of this Agreement shall be entitled to receive from the party against whom such provision is enforced, reasonable attorneys' fees and costs of litigation incurred by the other party in conjunction with any action or proceeding to enforce such provision.

7. **Cooperation**. The parties hereto are entering into this Agreement in good faith and shall cooperate in making effective and maintaining the effectiveness of the purposes of this Agreement and all of its terms and provisions. Each party shall, at the written request of any other party, join in taking any action which may be necessary or desirable to render the terms of this Agreement effective and to enable the party so requesting the cooperation to exercise the rights granted to it by this Agreement.

8. **Provisions Regarding Transfer of Restricted Stock on Books**. No transfer of shares of Stock shall be effective and the Company shall not transfer on its books the shares of Stock of a Stockholder unless and until the requirements of this Agreement shall have been first fully and strictly complied with and no transferee of such shares, or of any interest therein, shall have any rights with respect thereto or be a stockholder of the Company unless and until such time. Any purported or attempted transfer of shares of Stock not in strict compliance with this Agreement shall be void and shall have no force or effect.

9. **Adjustment Provisions**. In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, any Stock by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, stock dividend, split-up, distribution to Stockholders or combination of the Stock or any other change in capital structure of the Company, the Board of Directors shall take such reasonable and equitable action as its deems appropriate in good faith to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under this Agreement.

10. **Stock Certificates; Deposit with Company**.

(a) Legend. In order to implement the provisions of this Agreement, concurrently with execution of this Agreement, the Stockholder shall deposit with the Company each certificate representing shares of Stock, together with stock powers with respect to such certificates for transfer into the Company's name, whereupon the Company shall cause to be added to such certificates a legend in substantially the following form:

**THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, OR TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. TRANSFER OF THESE SHARES IS FURTHER RESTRICTED BY A STOCKHOLDER AGREEMENT, DATED AS OF [______________], A COPY OF WHICH MAY BE EXAMINED AT THE OFFICE OF THE COMPANY.**

(b) Custody. The Company shall hold the certificates and the stock powers in accordance with the following provisions.

(1) Delivery to Stockholder. Upon termination of the restrictions on transferability set forth in this Agreement, the Company shall deliver to the Stockholder such certificates and stock powers.

(2) Delivery to Transferee. Upon delivery of the written consent to a transfer in accordance with Paragraph 2, the Company shall cause to be delivered to the transfer agent the certificates and stock powers and such other documents necessary for the issuance of appropriate certificates evidencing the Stock giving effect to the transfer; provided, however, that such certificates shall continue to be held in custody by the Company in accordance with this Agreement and the Stockholder (with respect to any shares not transferred) and the transferee shall concurrently deposit stock powers with respect to such certificates with the Company.

(3) Delivery to the Principals or Company. Upon delivery by the Principals or the Company of a notice of exercise of Call Rights or upon receipt by the Company of a notice of exercise of Put Rights, the Company shall deliver the certificates and stock powers to the transfer agent for the purpose of closing the purchase of the Stock and transferring the shares to the Principals or the Company.

11. **Voting Agreement**. As a stockholder of the Company the Stockholder agrees to vote his shares of Stock for the election of the persons as directors to be designated by David G. Booth and Rex A. Sinquefield, which designation shall include each of them as a designee for the Board of Directors of the Company. This Agreement shall be an irrevocable proxy of the Stockholder appointing David G. Booth and Rex A. Sinquefield as the attorney, agent and proxy of Stockholder to vote Stockholder's shares of Stock as they in respect to such matters in their discretion deem proper, and to otherwise act including the execution of written consents, as Stockholder is entitled to vote or act with respect to such shares and such matters. This proxy is issued in consideration of the agreements and covenants set forth herein and, because coupled with an interest shall be irrevocable to the fullest extent permitted by law, provided however, that it will terminate upon the termination of the limitations on transferability of Stock imposed by this Agreement. A copy of this Agreement shall be kept in the corporate files of the Company.

12. **Sale of the Company; Tag-Along Rights.**

(a) Termination of Restrictions. If substantially all of the shares of Stock of the Company or substantially all of the assets of the Company are sold (a "Sale of the Company") or a tender offer for all or substantially all of the shares of Stock of the Company is made (a "Tender Offer"), then immediately prior to the closing of such Sale of the Company or Tender Offer (i) the restrictions on transferability of the Stock imposed by this Agreement shall lapse and (ii) the Company's Call Rights shall terminate and the Company shall, upon the request of the Stockholder, reissue Stockholder's shares of Stock without that portion of the legend thereon which makes reference to this Agreement. If a definitive agreement for the Sale of the Company is entered into or a Tender Offer is made after the Stockholder or the Company has given notice of his or its exercise of the Put or Call Rights but before any or all of the Stockholder's Stock has been purchased by the Company, the right and obligation of the Company to purchase any of the Stockholder's Stock which has not been purchased by the Company as of the date of such agreement for the Sale of the Company or Tender Offer may be terminated by the Stockholder upon notice to the Company. The Company shall give Stockholder prompt notice of a definitive agreement for the Sale of the Company or Tender Offer. If an agreement for the Sale of the Company or a Tender Offer does not result in all or substantially all of the common shares being purchased, then the restrictions on transferability of the Stock imposed by this Agreement and the Stockholder's Put Rights and the Company's Call Rights and obligations shall be reinstated.

(b) Tag Along Rights. The Board of Directors of the Company shall not consent to the transfer of Principal Stock to which the provisions of this subparagraph 12(b) apply unless the Principals have complied with this subparagraph 12(b).

(i) This subparagraph 12(b) shall apply if either or both of the Principals receive from a third party or third parties a bona fide offer or offers to purchase or otherwise acquire, in one, or a series of related transactions (which shall be deemed to be one transaction) (a "Tag-along Transfer Offer"), a number of shares equal to more than 50% of the Principal Stock then owned by the Principals collectively. If a Tag-along Transfer Offer is received, the Principals participating in the Tag-along Transfer Offer shall cause the Tag-along Transfer Offer to be reduced to writing and shall provide written notice (the "Tag-along Transfer Notice") of such Tag-along Transfer Offer to the Board of Directors and to each other Stockholder (the "Tag-along Transfer Offerees") in the manner set forth below. The Tag-along Transfer Notice shall identify the third party, the number of shares of Stock proposed to be sold in the Tag-along Transfer Offer, the identity of any Stockholders other than the Principals participating in the Tag-along Transfer Offer before applying the provisions of subparagraph 12(b), the price proposed to be paid for the Stock proposed to be sold in the Tag-along Transfer Offer and all other material terms and conditions of the Tag-along Transfer Offer, including, in the case of a Tag-along Transfer Offer in which the consideration payable for the Stock consists in part or in whole or consideration other than cash, a description of such other consideration.

      (ii) Each Tag-along Transfer Offeree shall have the right and option, exercisable as set forth below, to accept the Tag-along Transfer Offer for up to that number of the shares of Stock owned by such Tag-along Transfer Offeree determined in accordance with the provisions of this subparagraph 12(b) and to sell such number of shares in the Tag-along Transfer Offer. Each Tag-along Transfer Offeree that desires to exercise such option shall provide the Company with written irrevocable notice (a "Tag-along Acceptance Notice") within 10 Business Days after the date the Tag-along Transfer Notice is given (the "Notice Period"), specifying the number of shares that such Tag-along Transfer Offeree desires to include in the Tag-along Transfer Offer, and such Tag-along Transfer Offeree shall simultaneously (1) provide a copy of such Acceptance Notice to each of the Principals and the other Tag-along Transfer Offerees and (2) deliver to the Company a limited power-of-attorney authorizing the Principals participating in the Tag-along Transfer Offer to sell or otherwise dispose of such shares pursuant to the terms of the Tag-along Transfer Offer. Delivery of the Tag-Along Acceptance Notice and the limited power-of-attorney authorizing the Principals to sell or otherwise dispose of such shares shall constitute an irrevocable acceptance of the Tag-along Transfer Offer by such Tag-along Transfer Offeree and an authorization of the Company to deliver to the Principals in furtherance of the completion of the transaction contemplated by the Tag-Along Transfer Notice, the certificate or certificates representing the shares to be sold. If any Tag-along Transfer Offeree fails to deliver a Tag-along Acceptance Notice in respect of any Tag-along Transfer Notice or comply with the provisions of clause (1) and (2) above within the Notice Period, such Tag-along Transfer Offeree shall be deemed to have rejected the Tag-along Transfer Offer set forth in such Tag-along Transfer Notice.

(iii) Each Tag-along Transfer Offeree shall have the right to sell, pursuant to any Tag-along Transfer Offer and on the same terms and conditions as the shares being sold by the Principals, a number of shares equal to the lesser of (i) the number of shares set forth in such Tag-along Transfer Offeree's Tag-along Acceptance Notice and (ii) a number of shares equal to the product of (A) the total number of shares specified in the Tag-along Transfer Notice relating to such Tag-along Transfer Offer, times (B) a fraction, the numerator of which is the number of shares set forth in such Tag-along Transfer Offeree's Tag-Along Acceptance Notice, and the denominator of which is the aggregate number of shares specified in all of the Tag-along Transfer Acceptance Notices relating to the Tag-Along Transfer Offer. For purposes of determining the number of shares to be sold by the Principals and each Tag-along Transfer Offeree pursuant to this subparagraph 12(b)(iii), each of the Principals and any other Tag-Along Transfer Offerees identified in the Tag-Along Transfer Notice shall be deemed to be a Tag-Along Transfer Offeree who delivered a Tag-Along Transfer Acceptance Notice with respect to the number of shares of Stock which such Principal intended to sell in response to the offer that gave rise to the Tag-Along Transfer Offer. The shares which all Tag-along Transfer Offerees have elected to sell pursuant to this subparagraph 12(b) are referred to as the "Tag-along Transfer Offeree Shares".

(iv) Promptly after the consummation of the sale or other disposition of shares to a third party pursuant to a Tag-along Transfer Offer, the Principals shall notify each Tag-along Transfer Offeree thereof, shall remit to each Tag-along Transfer Offeree the total sales price of the shares which such Tag-along Transfer Offeree sold or otherwise disposed of pursuant thereto, and shall furnish such other evidence of the completion and time of completion of such sale or other disposition and the terms thereof as may be reasonably requested by any such Tag-along Transfer Offeree.

(v) If, at the end of a period of 120 days after the end of Notice Period, the Principals have not completed the sale of shares pursuant to the Tag-along Transfer Offer giving rise to such Notice, the Principals shall return to the Company all certificates representing shares which the Principals or their representative received in regard to such Tag-along Transfer Offeree. Upon such termination, provisions of this paragraph 12(b) shall again be in effect with respect to any renewal of such Tag-Along Transfer Offer or any other subsequent Tag-along Transfer Offer.

(vi) Notwithstanding anything contained in this subparagraph 12(b) to the contrary, there shall be no liability on the part of either of the Principals to any Tag-along Transfer Offeree if the sale of any Tag-along Offeree's shares pursuant to this subparagraph 12(b) is not consummated because the shares specified in the Tag-along Transfer Notice are not sold for whatever reason. The decision to consummate a sale of shares pursuant to this subparagraph 12(b) is in the sole and absolute discretion of the Principals.

13. **Public Offering**.

(a) Termination of Restrictions. Upon the occurrence of an underwritten public offering of Stock of the Company pursuant to an effective registration statement under the Securities Act of 1933 (the "1933 Act") (a "Public Offering"), (i) the restrictions on transferability of the Stock imposed by this Agreement shall lapse and (ii) the Call Rights of the Company and the Put Rights of the Stockholders shall terminate and the Company shall, upon the request of the Stockholder, reissue Stockholder's shares of Stock without that portion of the legend thereon which makes reference to this Agreement and such other modifications contemplated by paragraph (c) below. If a Public Offering occurs after the Stockholder or the Company has given notice of his or its exercise of the Put or Call Rights but before any or all of the Stockholder's Stock has been purchased by the Company, the right and obligation of the Company to purchase any of the Stockholder's Stock which has not been purchased by the Company shall terminate as of the commencement of the Public Offering.

(b) Participation in Public Offering. If the Company proposes to register any shares of Stock for its own account or for the account of any holder or holders of Stock in a Public Offering, the Company shall give prompt written notice to the Stockholders of its intention to do so and of Stockholders rights under this subparagraph 13(b). Such written notice shall be given at least 30 days prior to the anticipated filing date of the registration statement relating to the such registration. Any such notice shall offer all of the Stockholders the opportunity to include in such registration statement such number of shares of Stock as each such Stockholder may request in writing not later than 10 days after receipt of such notice. Such

request and right to have such shares included, as well as other procedural matters relating to participation in the Public Offering, shall be subject to:

(i) timely written notice to the Company by Stockholder of the Stockholder's request to sell Stock in the Public Offering, which notice shall constitute the Stockholder's agreement to sell such shares in the Public Offering on the same terms and conditions as apply to the Company and other Stockholders and to provide such information as the Company may request in connection with the Public Offering;

(ii) a pro rata reduction in the number of shares of Stock which may be sold in the Public Offering in the event the managing underwriter advises the Company that in its view the number of shares to be sold for Stockholders in such Public Offering, when added to the number of shares to be sold for the account of the Company, exceeds the largest number of shares which can be sold in the Public Offering without having an adverse effect on the Public Offering, including, without limitation, the price at which the Stock can be sold; and

(iii) such indemnification, contribution and expense sharing provisions by and among the Company, the Stockholders selling Stock in the Public Offering, and the underwriters as are customary in similar transactions.

All Stockholders (whether or not included in the Public Offering) shall agree and submit to such "holdback arrangements" as are reasonably requested by the underwriters in connection with the Public Offering, provided the duration of such arrangements shall not exceed 180 days.

(c) Securities Law Matters. Ninety days after the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether as a result of the Public Offering or otherwise), the Company shall upon request of Stockholder, in addition to the actions described in paragraph (a) above, and consistent with Rule 701 under the 1933 Act as then in effect, reissue Stockholder's shares of Stock with such legend, if any, as the Company deems appropriate to recognize that such shares of Stock may be sold pursuant to the applicable provisions of Rule 144 under the 1933 Act, which provisions would, as of the date hereof, permit an Stockholder who is not then an affiliate of the Company to sell the shares free of the holding period, volume restrictions and certain other requirements otherwise applicable to restricted securities.

14. **No Right of Continued Employment**. Nothing in this Agreement, nor any action of the Company or the Board of Directors shall be held or construed to confer upon any Stockholder any legal right to be employed by or to continue in the employ of the Company or its subsidiaries and each such employer expressly reserves the right to discharge any employee-Stockholder whenever the interest of the employer in its sole discretion may so require, without liability to such employer or its board of directors.

15. **Operational Matters**. The provisions of this Paragraph 15 shall apply until such time as the restrictions imposed on transferability of Stock imposed by the Agreement lapse pursuant to the provisions of Paragraph 12 or 13 above.

(a) Dividend Policy. The Company will establish a dividend policy which provides for quarterly distributions to Stockholders, in addition to the tax-related distributions required by Paragraph 5, of 100% of the annual cash flow from operations, less such amounts as the Board of Directors reasonably determines to retain as reserves for contingencies, capital expenditures or other corporate purposes.

(b) Stockholder Notification. In order to enable the Stockholders to provide the Board of Directors with input relating to certain matters, the Board of Directors will not take any of the following actions unless at least five business days' prior written notice of the intention to do so has been provided to the Stockholders:

(i) authorize the termination of the S Corporation Election or of any other action to revoke the S Corporation Election;

(ii) authorize a transaction which would result in the recognition of a significant amount of the "built-in gain" relating to the Company's conversion to S Corporation status (other than a transaction the consummation of which would be subject to Stockholder approval);

(iii) change the Company's policy with respect to distributions to Stockholders; or

(iv) except as otherwise permitted or required under this Agreement, issue Stock at a price below, or purchase Stock at a price above, the formula price that would be payable with respect to Stock subject to a current Put Election.

(c) Financial Statements. The Company will provide each Stockholder with a copy of Company's annual audited financial statements promptly after receipt thereof, and, upon request, will provide a copy of quarterly unaudited financial statements in the same format as provided to the Company's Board of Directors.

16. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to principles of conflict of laws.

17. **Entire Agreement; Effect on Original Agreement; Amendment**.

(a) This Agreement constitutes the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and there are no restrictions, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein.

(b) This Agreement may not be amended, modified or supplemented and no waivers or consents to or departures from the provisions hereof (each a "Modification") may be given unless consented to in writing by Stockholders holding not less than 51% of the outstanding shares of Stock; provided, however, that in the case of any Modification which modifies this Agreement in a manner which is adverse to a Stockholder, such Modification shall

not be effective with respect to such Stockholder unless consented to in writing by such Stockholder.

18. **Notices**. Any notice, request, instruction or other document given under this Agreement shall be addressed and delivered as set forth on the signature page or such other address as the parties may communicate to each other in writing at a later date.

19. **Binding Effect**.

(a) QSSTs and Permitted Trusts. This Agreement shall be executed by and binding upon the deemed owner of Stock held by a QSST or other trust which is eligible to be an S Corporation shareholder by reason of Section 1361 of the Code (a "permitted trust"), and, notwithstanding the fact that such Stock is held by the QSST or permitted trust, each such deemed owner shall be considered a Stockholder for purposes of all representations, warranties and agreements contained herein as if such Stock were held by such deemed owner.

(b) Spouse's Consent. To the extent not otherwise a party to this Agreement, this Agreement shall be executed by the spouse of the Stockholder, whereupon this Agreement shall be binding on the spouse with respect to any rights which the spouse may now or in the future have, including but not limited to any community or other marital property rights, in and to the Stock. If a spouse of a Stockholder refuses to execute this Agreement when requested to do so by the Company, the Company shall give notice to the Stockholder of such refusal and shall have the Call Rights described in Paragraph 3 with respect to the Stock held by such Stockholder. By executing this Agreement, such spouse represents, warrants and agrees that:

(i) the spouse understands the terms and provisions of this Agreement and the affects that it has on the Stockholder's and such spouse's rights with regard to the Stock;

(ii) the representations and warranties made by the Stockholder pursuant to Paragraph 5 are and will be true and correct with respect to the spouse as though made by the spouse; and

(iii) with respect to any and all such rights which spouse may now or in the future have in and to the Stock, that spouse shall be subject to all the terms and provisions of this Agreement as if such spouse were a Stockholder hereunder.

(c) Successors. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and on each Stockholder and such Stockholder's successors and assigns, legal representatives, executors and administrators.

(d) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one Agreement by and among the Company and the Stockholders.

20. **Arbitration**. In the event there arises any dispute as to the interpretation of the provisions of this Agreement, the Company and Stockholder mutually agree to submit the dispute to arbitration in Los Angeles, California before an impartial arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The decision or award of the arbitrator shall be accompanied by a written opinion of the arbitrator giving the reasons for the award. The impartial arbitrator shall be a person who has had ten or more years of experience as a member or employee of a nationally recognized investment banking firm, a nationally recognized firm of certified public accountants or a nationally recognized business appraisal firm, and shall be selected by joint agreement of the parties, but if the parties do not so agree within seven days of the request for arbitration made by either party, the selection shall be made by the American Arbitration Association. The parties elect to provide for pre-arbitration discovery, and the provisions of California Code of Civil Procedure governing pre-arbitration discovery are hereby incorporated into this Agreement. The arbitrator shall have the power to issue equitable relief including temporary or permanent injunction, and to award attorneys' fees and costs. The award rendered by the arbitrator shall be conclusive and binding upon the parties hereto and judgment may be entered upon such award in any court having jurisdiction hereof.

21. **Effective Date**. This Agreement shall become effective as of October 31, 2006 and shall be binding upon the Company and each Stockholder in accordance with the Share Exchange Agreement as if each Stockholder were a signatory hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth below.

**DIMENSIONAL HOLDINGS INC.**

By: Michael T Scardina

Michael T. Scardina
Vice President & Chief Financial Officer

DIMENSIONAL HOLDINGS INC.
1299 Ocean Avenue
Santa Monica, CA 90401
Attn: Chief Financial Officer

Date: October 31, 2006

**DEEMED OWNER** (GRANTOR OR BENEFICIARY)

______________________________

[Grantor(s) or Beneficiary of QSST or permitted Trust, if Trust is Stockholder]

Date:______________________________

Name(s):______________________________

______________________________

Address:______________________________

______________________________

______________________________

**STOCKHOLDER**
[Stockholder's spouse must also sign in space provided]

Signature obtained via your Share Exchange Agreement

. on stock
... in common, joint
... by the entirety must sign]

Date:______________________________

Name(s):______________________________

______________________________

Address:______________________________

______________________________

______________________________

**STOCKHOLDER'S SPOUSE**

______________________________

Date:______________________________

Name(s):______________________________

______________________________

Address:______________________________

______________________________

______________________________



EXHIBIT B

## Memorandum

**To:** Dimensional Holdings Inc. Stockholders

**From:** David B. Booth, Chairman

**Date:** August 1, 2007

**Re:** Transfer of Dimensional Holdings Inc. Shares

---

As you know, the Dimensional Holdings, Inc. ("Dimensional") Stockholders Agreement imposes certain rules and restrictions governing the transfer of Dimensional shares. These rules and restrictions are intended to enable Dimensional to maintain compliance with various tax and other requirements.

Until recently, these requirements served as an effective governor on the number of shareholders, enabling Dimensional to operate in the private, entrepreneurial fashion with which we have operated since 1981. Our recent holding company reorganization is an example of this, as we were able to contact you and receive a response all within a few weeks' time.

However, the increase in the number of permitted shareholders to 100 and the more recent change to treat a family as a single shareholder has started to present challenges to our ability to maintain our private, entrepreneurial way of doing things. The reason for this is that the actual number of shareholders we could have is virtually unlimited due to the family-equals-one shareholder rule. Unbridled growth in the number of actual stockholders raises new and different legal and operational considerations.

After careful consideration, the Board of Directors approved immediate implementation of the attached policy which will govern our actions under the Stockholders Agreement with respect to proposed transfers. The Board believes the attached policy represents an approach that is fair, appropriate and in the best interests of Dimensional and the shareholders. If you have any questions, please contact Catherine Newell at (512) 306-7400.

**Policy Relating to Transfers of Dimensional Stock**

***(Approved by the Board of Directors on April 20, 2007)***

| | |
|---|---|
| **Policy Statement Regarding Number and Make-Up of Stockholders** | The Board believes that it is in the best interests of Dimensional and its stockholders to preserve not only the company's S Corporation status, but also its private-company "feel" and way of doing business, which have been fostered by the personal relationships between Dimensional's founders, management and stockholders.<br><br>The S Corporation rules themselves promoted this policy, until the amendment of the S Corporation rules to increase the number of permitted shareholders to 100, and subsequently to treat families as a single shareholder. This Policy Relating to Transfers of Dimensional Stock is in response to the potential negative effect of the liberalization of the S Corporation rules on Dimensional. |
| **Exercise of Call Rights** | In furtherance of the foregoing, it has been and will continue to be Dimensional's policy to exercise call rights whenever the right arises under the Stockholders Agreement. This most commonly occurs whenever an employee-stockholder's employment terminates or in the event of death of a stockholder. Very limited exceptions to this policy have been and may in the future be considered and approved. |
| **Consent to Gift and Other Transfers Which Do Not Create a Call Right** | Since most gift and other not-for-value transfers involve the stockholder's family members, it will usually be the case that such transfers will not affect S Corporation status. However, the addition of more stockholders through inter-generational transfers will generally fall outside the policy considerations stated above. As a result, such inter-generational transfers will no longer be permitted unless otherwise approved by the Board of Directors under very limited circumstances that fall within the policy considerations stated above. |
| **Implications of the Policy to Common Situations** | • Stockholders will continue to be permitted to transfer shares to the stockholder's spouse provided he or she is an eligible S Corporation shareholder.<br><br>• All stockholders will continue to be permitted to transfer shares to a trust so long as, at all times during which the trust will own shares during the stockholder's lifetime, the stockholder remains the "deemed owner" of the shares. Therefore, the shares held by the trust will remain subject to the call provisions of the Stockholders Agreement upon the stockholder's death.<br><br>• Employee shares will continue to be non-transferable, except |

| | |
|---|---|
| | into a trust described above. |